# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------------x

Evgeny A. Freidman, Vladimir Basin,
Mamed Dzhaniyev, Victory Taxi Garage
Inc., Tunnel Taxi Management, LLC,
Downtown Taxi Management, LLC, Bazar
Taxi Inc. Patron Taxi LLC, Grappa Taxi
LLC, Cognac Taxi LLC, Calvados Taxi
LLC, Tequila Taxi LLC, Jack Daniels
Taxi LLC, Murzik Taxi Inc., Malinka
Taxi Inc., Yagodka Taxi Inc., Persik Taxi
Inc., Bratishka Taxi Inc., Pumo Taxi Inc.,
Piguet Taxi Inc., Kormilitsa Taxi Inc.,
Prada Taxi, Inc., Student Taxi, Inc., Hublot
Taxi Inc., Torpedo Taxi Inc., Black Label
Taxi LLC, Praga Taxi Inc., Two Hump Taxi
LLC, Kroshka Taxi Inc., Lacoste Taxi Inc.,
Sangria Taxi LLC, Volba Taxi Inc.,

**Civil Action No. 1:08-CV-02458 (SAS)**

Plaintiffs,

v.

General Motors Corp., ElDorado
National, Inc., and Arcola Sales &
Service Corp.,

Defendants.

----------------------------------------------------x

## DEFENDANTS GENERAL MOTORS CORPORATION'S AND ELDORADO NATIONAL, INC.'S MEMORANDUM OF LAW IN SUPPORT OF JOINT MOTION TO DISMISS

Robert H. Pees
Jamison A. Diehl
AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Telephone: (212) 872-8054
Facsimile: (212) 872-1002
jdiehl@akingump.com

*Attorneys for Defendant ElDorado National, Inc.*

Timothy J. McHugh
Lavin, O'Neil, Ricci, Cedrone & DiSipio
420 Lexington Avenue
Graybar Building
Suite 2900
New York, New York 10170
Telephone: (212) 319-6898
Facsimile: (212) 319-6932
tmchugh@lavin-law.com
*Attorneys for Defendant General Motors Corporation*

## **TABLE OF CONTENTS**

PRELIMINARY STATEMENT................................................................................1

FACTUAL BACKGROUND .............................................................................2

ARGUMENT ...................................................................................................8

    I.    APPLICABLE STANDARDS................................................................8

        A.    The Standard Under Rule 12(b)(6) ................................................8

        B.    Pleading Fraud Under Rule 9(b) ..................................................9

    II.    PLAINTIFFS' FRAUD CLAIM FAILS AS A MATTER OF LAW.....................11

        A.    Plaintiffs' Allegations Demonstrate That They Have Failed To Plead Any Fraudulent Statements Or Conduct ........................................11

            1.    Plaintiffs' Fraud Claims are Barred as Duplicative of their Contract and Dismissed Warranty Claims .....................................12

            2.    Plaintiffs Have Alleged No Facts that Give Rise to Any Inference of Fraudulent Intent ........................................15

            3.    Plaintiffs Have Failed To Allege Justifiable Reliance ..................19

    III.    PLAINTIFFS HAVE IGNORED THE COURT'S ORDER IN FAILING TO LIMIT THE BREACH OF EXPRESS WARRANTY CLAIMS TO THE LIMITED WARRANTIES ISSUED BY GENERAL MOTORS AND ELDORADO.................................................................................20

CONCLUSION..............................................................................................21

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Acito v. IMCERA Group, Inc.*, 47 F.3d 47 (2d Cir. 1995) ..................................10

*Bell Atl. Corp. v. Twombly*, 127 S. Ct. 1955 (2007) ......................................... 8-9

*Best Western Int'l v. CSI Int'l Corp.*, No. 04 Civ. 0360 (LMM), 1994 WL 465905
   (S.D.N.Y. Aug. 23, 1994) ...........................................................13

*Brass v. Am. Film Techs., Inc.*, 987 F.2d 142 (2d Cir. 1993) ...............................9

*Bridgestone/Firestone, Inc. v. Recovery Credit Servs., Inc.*, 98 F.3d 13 (2d Cir.
   1996) ............................................................................14

*Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42 (2d Cir. 1991) *cert. denied*,
   503 U.S. 960, 112 S. Ct. 1561, 118 L. Ed. 2d 208 (1992)............................9

*Courtenay Commc'ns., Corp. v. Hall*, 334 F.3d 210 (2d Cir. 2003)...................9

*DiVittorio v. Equidyne Extraction Indus., Inc.*, 822 F.2d 1242 (2d Cir. 1987) ...............11

*Equitable Life Assurance Soc'y v. Alexander Grant & Co.*, 627 F. Supp. 1023
   (S.D.N.Y. 1985) .................................................................11

*Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co. of New York*, 375
   F.3d 168 (2d Cir. 2004)..........................................................10

*First Nationwide Bank v. Gelt Funding Corp.*, 27 F.3d 763 (2d Cir. 1994).......................8

*Kahn v. Kohlberg, Kravis, Roberts & Co.*, 970 F.2d 1030 (2d Cir. 1992) ..........................8

*Lerner v. Fleet Bank, N.A.*, 459 F.3d 273 (2d Cir. 2006) ...................................10

*Luce v. Edelstein*, 802 F.2d 49 (2d Cir. 1986) .............................................11

*Mills v. Polar Molecular Corp.*, 12 F.3d 1170 (2d Cir. 1993)...................................10, 16

*PI, Inc. v. Quality Prods., Inc.*, 907 F. Supp. 752 (S.D.N.Y. 1995) .....................12, 15, 16

*Philadelphia Parking Auth. v. Fed. Ins. Co.*, 385 F. Supp. 2d 280 (S.D.N.Y.
   2005) ............................................................................8

*Port Dock & Stone Corp. v. Oldcastle Ne., Inc.*, 507 F.3d 117 (2d Cir. 2007) ..................9

*Powers v. British Vita, P.L.C.*, 57 F.3d 176 (2d Cir. 1995)...............................15

*Primavera Familienstiftung v. Askin*, 173 F.R.D. 115 (S.D.N.Y. 1997) .........................19

*Schlick v. Penn-Dixie Cement Corp.*, 507 F.2d 374 (2d Cir. 1974), *cert. denied*,
   421 U.S. 976, 95 S. Ct. 1976, 44 L. Ed. 2d 467 (1975)..............................11

*Segal v. Gordon*, 467 F.2d 602 (2d Cir. 1972) ....................................................11

*Seneca Ins. Co. v. Kemper Ins. Co.*, No. 02 Civ. 10088 (PKL), 2004 WL 1145830
    (S.D.N.Y. May 21, 2004)..........................................................................8

*Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124 (2d Cir. 1994) ..............11, 15, 16, 18, 19

*Sudul v. Computer Outsourcing Servs.*, 868 F. Supp. 59, 62 (S.D.N.Y. 1994) ...............13

*Wallach Marine Corp. v. Donzi Marine Corp.*, 675 F. Supp. 838 (S.D.N.Y. 1987).........14

## STATE CASES

*Kaufman v. Cohen*, 307 A.D.2d 113, 760 N.Y.S.2d 157 (1st Dep't 2003) .......................10

*Kelly v. Defoe Corp.*, 223 A.D.2d 529, 636 N.Y.S.2d 123 (2d Dep't 1996).....................14

*Morgan v. A.O. Smith Corp.*, 265 A.D.2d 536, 697 N.Y.S.2d 152 (2d Dep't 1999) .........12

*Tiffany at Westbury Condominium v. Marelli Dev. Corp.*, 40 A.D.3d 1073, 840
    N.Y.S.2d 74 (2d Dep't 2007) ....................................................................12

*Weitz v. Smith*, 231 A.D.2d 518, 647 N.Y.S.2d 236 (2d Dep't 1996) .............................13

## STATUTES AND RULES

Fed. R. Civ. P. 9(b) ...............................................................1, 10, 15, 19, 21

Fed. R. Civ. P. 12(b)(6)..............................................................1, 8, 9, 21

RCNY tit. 35, ch. 3 § 3-03.2, p. 399, n.1 (N.Y. Leg. Publ'g. Corp. 2008)........................7

## OTHER AUTHORITIES

5 C. Wright, Miller, *Federal Practice and Procedure*, § 1298 (1969)..............................11

JAMES W.M. MOORE ET AL., MOORE'S FEDERAL PRACTICE §
    12.34[4][a] ......................................................................................8

Defendants General Motors Corporation ("General Motors") and ElDorado National, Inc. ("ElDorado"), through their respective undersigned counsel, respectfully submit this Memorandum of Law in support of their Joint Motion to Dismiss the Third Amended Complaint (the "Complaint") pursuant to Federal Rules of Civil Procedure 12(b)(6) and 9(b).

## PRELIMINARY STATEMENT

Plaintiffs' cause of action for fraud was added to the Second Amended Complaint (which this Court dismissed) based on the purported discovery of an alleged "bait-and-switch" which, the new pleading shows, is based on pure *nonsense*. The so-called "bait-and-switch," the impetus for Plaintiffs' entire fraud claim, is based on the alleged fact that the first Uplander delivered to Plaintiffs in mid-July 2006 was different than the demonstration vehicle presented to the Taxi and Limousine Commission ("TLC") earlier in May. But Plaintiffs allege that the TLC rejected the demonstration vehicle and, indeed, "told Defendants that the Uplander presented *would not be suitable* for use as a wheelchair accessible taxicab in New York City *unless certain modifications were made to the vehicle*." Thus, the alleged fraud based on Defendants' delivery of a vehicle "materially different" than the vehicle the TLC told Defendants to modify, in itself, simply makes no sense.

With respect to the statements alleged to be false, the Complaint makes it plain that Plaintiffs' breach of contract claim, and the allegations of various implied and express warranties that have been dismissed, have simply been re-clothed in the costume of a fraud claim. Plaintiffs omit to allege a single fact giving rise to even the most tepid inference of fraudulent intent, and, indeed, the Complaint's contradictory allegations decisively rule it out. Plaintiffs' allegations of reliance are equally self-defeating. In short, Plaintiffs' Fourth Cause of Action for fraud should be dismissed with prejudice.

As for Plaintiffs' breach of express warranty claims, the vestiges of Plaintiffs' dismissed prior complaint are evident in the current pleading. Indeed, in derogation of the Court's Order, Plaintiffs continue to allege the existence of express warranties (and plead damages) beyond the terms of the limited warranties issued by General Motors and ElDorado. For these reasons, and as shown below, Plaintiffs' Complaint against General Motors and ElDorado should be dismissed in its entirety.

## FACTUAL BACKGROUND

### The Causes of Action

Plaintiffs' Complaint asserts four causes of action: (i) breach of contract against Arcola Sales & Service Corp. ("Arcola"), (ii) breach of express warranty against General Motors, (iii) breach of express warranty against ElDorado, and (iv) fraud and misrepresentation against General Motors and ElDorado. *See* Compl. ¶ 89 *et seq*. In response to previous motions to dismiss, Plaintiffs dropped their breach of contract claims against General Motors and ElDorado and also abandoned a claim for injunctive relief. Deficiencies in Plaintiffs' Second Amended Complaint were addressed by this Court in its decision on General Motors' and ElDorado's joint motion to dismiss, which was granted. *See* Opinion and Order, *Freidman, et al. v. General Motors, et al.*, Civ. A. No. 1:08-CV-02458 (SAS), dated February 23, 2009 (the "Order").

Specifically, the Court dismissed Plaintiffs' implied warranty claims with prejudice, rejected Plaintiffs' attempt to evade the terms of the respective written limited warranties issued by General Motors and ElDorado, and dismissed Plaintiffs' fraud claim. Plaintiffs have been given leave to amend their breach of express warranty claim, but are limited to alleging warranty breaches on the basis of the limited warranties issued by General Motors and ElDorado, and are barred from seeking recovery of incidental or consequential damages. Plaintiffs also have been given leave to attempt to amend a putative fraud claim.

The amended pleading makes it plain, however, that Plaintiffs cannot state a claim for fraud and that this case, rightfully, concerns whether Defendants fulfilled their respective obligations under the terms of the written warranties. Plaintiffs have managed, however, to violate the Court's order limiting any express warranty claim to the actual written limited warranties, and also have run afoul of the Court's proscription regarding damages.

## The Medallion Auction

In 2004, Plaintiffs successfully bid on eleven (11) Accessible Medallions that were auctioned by the TLC for use with wheelchair-accessible taxis, and then, two years later, successfully bid on fifty-four (54) Accessible Medallions auctioned by the TLC in the June 2006 auction. *See* Order at 2-3. Plaintiffs swept the medallion auction in 2006 and paid nearly $26 million for those fifty-four (54) medallions. *Id.* at 3.

## The Self-Contradictory and Nonsensical Allegations Of Fraud

The Complaint alleges misrepresentations by General Motors and ElDorado on which Plaintiffs contend they relied in deciding to bid on the 54 Accessible Medallions at the June 2006 auction, and in agreeing to purchase the Uplanders from Defendants. Compl. ¶ 128. Plaintiffs' allegations, and the documents quoted in the Complaint, however, refute the notion that General Motors or ElDorado made any fraudulent statements. *Id.*

### *The Alleged Statement in May prior to the June Auction*

Plaintiffs allege that in May 2006, "Chuck Compagnoni of GM represented to Plaintiff Evgeny Freidman that GM, along with ElDorado, could engineer the Chevy Uplander to comply with the TLC's new specifications applicable to taxicabs with Accessible Medallions." Compl. ¶ 124. Plaintiffs allege that this May statement was "false when made", *id.* ¶ 126, and also that Plaintiffs relied on it in deciding to purchase medallions at the TLC's medallion auction in June 2006. *See id.* ¶¶ 126, 128. Thus, according to the Complaint, Plaintiffs made their decision to

purchase the medallions sometime after being told that Defendants could engineer the Uplander to comply with the TLC's new specifications.

The Complaint, however, quotes lead-Plaintiff Freidman in an email that he sent to Mr. Rolfe of Arcola on July 21, 2006 in which Mr. Freidman, elsewhere in that same email, states that he planned to bid on the accessible medallions in January or February.  Compl. ¶ 70.  Thus, Mr. Freidman states:

> "i anticipated being successful at the auction in <u>january and february</u>, that is why i started a dialogue with arcola and eldorado back then and ordered 2 cars!

Declaration of Jamison A. Diehl ("Diehl Decl."), Exhibit ("Exh.") A.  This is but one of several examples in which Plaintiffs' own documents contradict the Complaint's allegations.  Here, of course, Mr. Freidman's email indicates that Plaintiffs' decision to purchase the medallions had been made sometime before May (indeed, even before Mr. Freidman contacted any of the Defendants).[1]

The TLC's "new specifications" were issued on May 11, 2006. *Id.* ¶ 58.  A day earlier, on May 10, 2006 General Motors and ElDorado presented a model of the Uplander "to the TLC for demonstration." *Id.* ¶ 57.  At the demonstration, the TLC determined that the vehicle did not meet the TLC's specifications, *id.* ¶ 53, and "told Defendants that the Uplander presented would not be suitable for use as a wheelchair accessible taxicab in New York City unless certain modifications were made to the vehicle." *Id.* ¶ 57.  The following day, the TLC established "certain new specifications for New York City taxicabs that would be operating with Accessible Medallions," *id.* ¶ 58.  Sometime thereafter – Plaintiffs do not specify when – Mr. Compagnoni

---

[1] Further, Plaintiffs' contention that Defendants' statement in May that they could engineer the Uplanders to comply with the TLC's new specification was known to be "false when made" cannot be reconciled with the fact that, as the Complaint indicates, the TLC's specifications did not even become final until June 6, 2006.  Compl. ¶ 59.

allegedly told Mr. Freidman that that "GM, along with ElDorado, could engineer the Chevy Uplander to comply with the TLC's new specifications applicable to taxicabs with Accessible Medallions." *Id.* ¶ 124. Plaintiffs allege that this statement was false when made, but do not state why it was false or how it was known to be false other than alleging, on information and belief, that Defendants "never intended to fulfill the foregoing representation[]". *Id.* ¶ 127.

### *The Alleged Statements in June and July*

Plaintiffs allege that Defendants submitted written specifications of the modifications they intended to make to the Uplander to comply with the TLC's new specifications, and that the TLC approved those specifications on or about June 6, 2006. *Id.* ¶ 59. Plaintiffs allege that sometime thereafter Mr. Compagnoni told Mr. Freidman that the TLC had approved Defendants' proposed specifications, and that General Motors and ElDorado would use these specifications in producing wheelchair accessible taxis. Compl. ¶ 124. Plaintiffs contend that this statement was false, and known to be false when made, notwithstanding that the TLC had just approved Defendants' specifications for the Uplander. *See id.* ¶ 126.

In mid-July, following the TLC's rejection of the demonstration vehicle in May and Plaintiffs' success at the medallion auction in June, Plaintiffs took delivery of one of two Uplanders they had ordered from Arcola. *Id.* ¶ 66. Plaintiffs allege that when this initial vehicle was delivered, it "was inspected by the TLC to make sure that it complied with its new specifications." *Id.* The vehicle, however, allegedly was not in compliance with the TLC's new specifications. *Id.*

Mr. Foerschler allegedly told Mr. Freidman that Defendants would "fix and 're-engineer' the Uplanders to comply with the TLC's new specifications and Plaintiffs['] needs." *Id.* ¶ 124. Plaintiffs contend that this July statement, like the May and June statements, was false, again,

based on the information and belief allegation that Defendants "never intended to fulfill the foregoing representations." *Id.* ¶ 127.

Plaintiffs also contend that because the initial vehicle delivered in mid-July was "materially different than (and inferior to) the demonstration model presented to the TLC in May" – *i.e.*, the demonstration model *rejected* by the TLC – that General Motors and ElDorado had engaged in a "bait-and-switch." *Id.* ¶ 125.

Mr. Friedman's criticism of the initial vehicle delivered in mid-July was unrestrained and, according to the Complaint, "he was considering purchasing wheelchair accessible vehicles from another manufacturer." *Id.* ¶ 71. Thus, according to the Complaint, by mid-July 2006, Plaintiffs had ordered a total of two vehicles and had taken delivery of one, which they found to be unsatisfactory and, moreover, Mr. Freidman was considering another manufacturer in lieu of Defendants General Motors and ElDorado. Thus, notwithstanding that Plaintiffs allegedly discovered that they were the victims of a "bait-and-switch" (of one inferior vehicle for another inferior vehicle), had no commitment to purchase any additional vehicles from Defendants, and could have purchased wheelchair accessible vehicles from "another manufacturer," *id.*, Plaintiffs state that they "had no choice but to wait for Defendants to comply with their representations and promises." *Id.* ¶ 72.

### *The Alleged August 2006 Statement*

On August 15, 2006, Mr. Freidman allegedly was advised by an ElDorado representative "that the re-engineering or 'upfit' of the initial two Uplanders had been completed" and also that these vehicles had been approved by the TLC. *Id.* ¶ 73. Plaintiffs allege, on the basis of information and belief, that the vehicles, in fact, had not been approved by the TLC, *id.*, and further state: "The allegedly 'TLC approved' and 're-engineered' Uplanders started to be

delivered to Plaintiffs in August 2006, and Plaintiffs received *all of the Uplanders they had purchased by November 2006.*" *Id.* ¶ 74 (emphasis added). Thus, Plaintiffs appear to contend that they were induced into purchasing all 52 Uplanders in reliance on the allegedly false statement that the "re-engineered" vehicles had been approved by the TLC.

However, the sales orders with Arcola, of which the Court previously has taken notice, indicate that only 4 vehicles had been purchased by November 2006. *See* Diehl Decl. Exh. B. Indeed, sales orders for the remaining forty-eight (48) vehicles were not signed by Plaintiffs until December 21, 2006. *See id.* Thus, when Plaintiffs state that they "received all of the Uplanders they had purchased by November 2006," *id.*, to be clear, Plaintiffs had purchased and received a total of 4 vehicles by that date.

**The Approval of the Vehicles By the TLC**

Plaintiffs admit that the TLC approved the specifications for the Uplanders in June 2006. *Id.* ¶ 59. The TLC had, in fact, approved the vehicles by that time. *See* Section 1, Title 35, chapter 3 of the Rules of the City of New York, effective as of June 25, 2006 ("The Taxi and Limousine Commission staff has identified two vehicles currently in production that meet the specifications [for accessible taxicabs] – the Chevrolet Uplander, as modified by ElDorado National, and as modified by Braun Corporation and sold as the Braun Entervan."). RCNY tit. 35, ch. 3 § 3-03.2, p. 399, n.1 (N.Y. Leg. Publ'g. Corp. 2008).

**The Allegations of Express Warranty Breaches**

The Complaint alleges breach of the respective limited warranties issued by General Motors and ElDorado, and that the warranties failed of their essential purpose. *See* Compl. ¶¶ 110, 122. The Complaint, however, also alleges that "Defendants . . . warranted to Plaintiffs that the Vehicles complied with the American Disabilities Act (ADA), the Administrative Code

of the City of New York, and the TLC wheelchair-accessibility requirements." *Id.* ¶ 54. Neither the General Motors nor ElDorado limited warranty includes these alleged warranty terms.

In its decision, the Court characterized the above allegation as among the non-binding "vague statements about representations defendants [allegedly] made to plaintiffs" that, in any event, were "barred by the parol evidence rule as both GM and ElDorado gave the Taxi Companies written warranties." *See* Order at 11-12. Plaintiffs thus persist in alleging the existence of express warranties that have already been dismissed by the Court.

## ARGUMENT

I.     **APPLICABLE STANDARDS**

A.     **The Standard Under Rule 12(b)(6)**

Federal Rule of Civil Procedure 12(b)(6) authorizes the dismissal of a complaint for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). In considering a motion to dismiss for failure to state a claim, the Court must accept the allegations contained in the complaint as true and draw all reasonable inferences therefrom in favor of the non-moving party. *Philadelphia Parking Auth. v. Fed. Ins. Co.*, 385 F. Supp. 2d 280, 286 (S.D.N.Y. 2005). "The complaint, however, 'must include allegations concerning each of the material elements necessary to sustain recovery under a viable legal theory.'" *Seneca Ins. Co. v. Kemper Ins. Co.*, No. 02 Civ. 10088 (PKL), 2004 WL 1145830, at *3 (S.D.N.Y. May 21, 2004) (citation omitted). Thus, the complaint should be dismissed if the plaintiff fails to allege the elements of its cause of action or if the pleadings demonstrate an affirmative defense. *See* 2 JAMES W.M. MOORE ET AL., MOORE'S FEDERAL PRACTICE § 12.34[4][a], [b] (3d ed. 2006); *see also Kahn v. Kohlberg, Kravis, Roberts & Co.*, 970 F.2d 1030, 1039-42 (2d Cir. 1992). Moreover, conclusions of law and vague, conclusory assertions need not be accepted. *See, e.g., First Nationwide Bank v. Gelt Funding Corp.*, 27 F.3d 763, 771 (2d Cir. 1994); *Bell Atl.*

*Corp. v. Twombly*, 127 S. Ct. 1955, 1964-65 (2007) (a plaintiff must allege "more than labels and conclusions" to establish a viable cause of action) (citing *Papasan v. Allain*, 478 U.S. 265, 286, 106 S. Ct. 2932 (1986)).  Indeed, a complaint's factual allegations must make it at least plausible that the plaintiff is entitled to relief.  *See Port Dock & Stone Corp. v. Oldcastle Ne., Inc.*, 507 F.3d 117, 120-21 (2d Cir. 2007) (under *Twombly*, "a complaint must allege facts that are not merely consistent with the conclusion that the defendant violated the law, but which actively and plausibly suggest that conclusion") (citing *Twombly*, 127 S. Ct. at 1966).

Although matters outside the pleadings are not considered on a motion to dismiss, *see Courtenay Commc'ns., Corp. v. Hall*, 334 F.3d 210, 213 (2d Cir. 2003), among the items that may be considered are documents incorporated by reference into the pleadings, matters of which judicial notice may be taken, or documents either in the pleading party's possession or of which that party had knowledge and relied on in bringing its claims. *Brass v. Am. Film Techs., Inc.*, 987 F.2d 142, 150 (2d Cir. 1993) (citation omitted).  Accordingly, Plaintiffs' Sales Orders with Arcola which this Court has previously considered, as well as the documents quoted and relied upon in the Complaint, may be considered by the Court in deciding General Motors' and ElDorado's motion to dismiss.  *See, e.g., Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 48 (2d Cir. 1991), *cert. denied*, 503 U.S. 960, 112 S. Ct. 1561, 118 L. Ed. 2d 208 (1992) ("Where plaintiff has actual notice of all the information in the movant's papers and has relied upon these documents in framing the complaint the necessity of translating a Rule 12(b)(6) motion into one under Rule 56 is largely dissipated.").

### B.   Pleading Fraud Under Rule 9(b)

To state a cause of action for fraud under New York law, "a plaintiff must allege a representation of material fact, the falsity of the representation, knowledge by the party making the representation that it was false when made, justifiable reliance by the plaintiff and resulting

injury." *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 291 (2d Cir. 2006) (quoting *Kaufman v. Cohen*, 307 A.D.2d 113, 119, 760 N.Y.S.2d 157, 165 (1st Dep't 2003)). Plaintiffs must not only plead the elements of a fraud claim under New York law, but also must meet the pleading requirements of Rule 9(b) of the Federal Rules of Civil Procedure, which provides that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity."

In order to comply with Rule 9(b), "the complaint must: (1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 290 (2d Cir. 2006) (quoting *Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1175 (2d Cir. 1993)). Rule 9(b) further provides that "[m]alice, intent, knowledge, and other condition of mind of a person may be averred generally." Fed. R. Civ. P. 9(b). The Second Circuit has cautioned, however, that because "we must not mistake the relaxation of Rule 9(b)'s specificity requirement regarding condition of mind for a license to base claims of fraud on speculation and conclusory allegations[,] . . . plaintiffs must allege facts that give rise to a *strong inference of fraudulent intent.*" *Acito v. IMCERA Group, Inc.*, 47 F.3d 47, 52 (2d Cir. 1995) (internal quotation marks and citation omitted) (emphasis added). *See also Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co. of New York*, 375 F.3d 168, 187 (2d Cir. 2004) ("this leeway is not a 'license to base claims of fraud on speculation and conclusory allegations'") (quoting *Acito*, 47 F.3d at 52). "The requisite 'strong inference' of fraud may be established either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious

misbehavior or recklessness." *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1128 (2d Cir. 1994).

Generally, fraud pleadings cannot be based on information and belief. *DiVittorio v. Equidyne Extraction Indus., Inc.*, 822 F.2d 1242, 1247 (2d Cir. 1987); *Segal v. Gordon*, 467 F.2d 602, 608 (2d Cir. 1972). The exception concerns fraud allegations as to facts peculiarly within the opposing party's knowledge. However, even then, such information and belief allegations must be accompanied by a statement of facts upon which the belief is founded. *See Luce v. Edelstein*, 802 F.2d 49, 54 n. 1 (2d Cir. 1986); *Schlick v. Penn-Dixie Cement Corp.*, 507 F.2d 374, 379 (2d Cir. 1974), *cert. denied*, 421 U.S. 976, 95 S. Ct. 1976, 44 L. Ed. 2d 467 (1975); *Equitable Life Assurance Soc'y v. Alexander Grant & Co.*, 627 F. Supp. 1023, 1029 (S.D.N.Y. 1985); 5 C. Wright, Miller, *Federal Practice and Procedure*, § 1298, at 416 (1969).

With these standards in mind, and as demonstrated below, Plaintiffs' Complaint should be dismissed.

## II.     PLAINTIFFS' FRAUD CLAIM FAILS AS A MATTER OF LAW

### A.     Plaintiffs' Allegations Demonstrate That They Have Failed To Plead Any Fraudulent Statements Or Conduct

As discussed above, Plaintiffs allege that in May 2006, General Motors and ElDorado falsely "represented to Plaintiff Evgeny Freidman that GM, along with ElDorado, could engineer the Chevy Uplander to comply with the TLC's new specifications applicable to taxicabs with Accessible Medallions." Compl. ¶ 124. In June, after the TLC approved the written specifications applicable to the Uplander, Plaintiffs allege that Mr. Compagnoni told Mr. Freidman that General Motors and ElDorado "would use these specifications in producing wheelchair accessible taxicabs." *Id.* After Plaintiffs took delivery of the first Uplander in July and discovered problems with the vehicle, Plaintiffs further allege that Defendants' stated that

they would "fix and 're-engineer' the Uplanders to comply with the TLC's new specifications." *Id.* With respect to the single vehicle delivered in July, Plaintiffs allege that Defendants engaged in a bait-and-switch because that vehicle was different than the demonstration vehicle rejected by the TLC in May. *Id.* ¶ 125. Finally, Plaintiffs allege based on information and belief that an alleged statement in August that the two "re-engineered" Uplanders' had been approved by the TLC was false. *Id.* ¶ 73.

### 1. Plaintiffs' Fraud Claims are Barred as Duplicative of their Contract and Dismissed Warranty Claims

Although Plaintiffs' Fourth Cause of Action purports to sound in fraud, it is really nothing other than a claim for breach of express warranty and contract (Plaintiffs' First, Second and Third Causes of Action) in another guise. Stripped of the muddied factual allegations, the essence of the claim is that General Motors and ElDorado failed to provide vehicles that complied with the TLC's specifications and that were suitable for use as New York City taxicabs.

The law of New York is clear that a claim for fraud that arises out of the same facts and circumstances as a breach of warranty or contract claim is invalid. *See, e.g., Tiffany at Westbury Condo. v. Marelli Dev. Corp.*, 40 A.D.3d 1073, 1077, 840 N.Y.S.2d 74, 78 (2d Dep't 2007) (affirming dismissal of fraud claim as "wholly duplicative of the breach of contract and warranty claims"); *Morgan v. A.O. Smith Corp.*, 265 A.D.2d 536, 697 N.Y.S.2d 152 (2d Dep't 1999) (affirming dismissal of fraud claim "since the facts alleged in support of that cause of action were duplicative of the facts alleged in support of the time-barred causes of action to recover damages for breach of warranty"); *PI, Inc. v. Quality Prods., Inc.*, 907 F. Supp. 752, 761 (S.D.N.Y. 1995) (citing numerous Appellate Division cases where courts held that a cause of action for fraud cannot exist when the fraud claim arises out of the same facts as a breach of contract claim with the sole additional allegation that the defendant never intended to fulfill its

express contractual obligations); *Best Western Int'l v. CSI Int'l Corp.*, No. 04 Civ. 0360 (LMM), 1994 WL 465905, at *4 (S.D.N.Y. Aug. 23, 1994) (stating that the majority of courts, including the Appellate Division, have held that "simply dressing up a breach of contract claim by further alleging that the promisor had no intention, at the time of the contract's making, to perform its obligations thereunder, is insufficient to state an independent tort claim"). New York law deems such a claim one for "fraudulent breach of contract" and it is not recognized. *Weitz v. Smith*, 231 A.D.2d 518, 647 N.Y.S.2d 236 (2d Dep't 1996). As the court in *Sudul* concluded, "[a] plaintiff . . . should not be allowed to bootstrap a breach of contract claim into a fraud claim by simply including in his complaint an allegation that defendant never intended to hold up his end of the deal." *Sudul v. Computer Outsourcing Servs.*, 868 F. Supp. 59, 62 (S.D.N.Y. 1994).

This rule of law applies squarely to the allegations set out in the Fourth Cause of Action. Unadorned, Plaintiffs' allegations of fraud amount to no more than a claim that General Motors and ElDorado breached a promise to provide vehicles that complied with the TLC's specifications and that were suitable for use as New York City taxicabs. This claim is identical to Plaintiffs' First Cause of Action for breach of contract, which alleges: "The Vehicle Orders specified, as Defendants represented and agreed to do in emails and other communications, that as part of the retrofitting process, Defendants would make the Vehicles comply with the TLC's specifications and be suitable for use as new York City taxicabs." Compl. ¶ 64; *see also id.* ¶ 91 (alleging that the "Vehicle Orders . . . incorporated promises made by Defendants GM and ElDorado").[2]

---

[2] Plaintiffs' fraud claim also rests on allegations substantially similar to those allegations underlying the aspects of Plaintiffs' express warranty claim that have been dismissed, as well as the implied warranty claims that have been dismissed. *See, e.g.*, Second Amended Complaint ¶ 94 (alleging that express warranties were breached because the Uplanders were not "fit for use

In order for fraud and breach of warranty claims to co-exist in the same action, the plaintiff must: (1) demonstrate a legal duty separate from the duty to perform under the warranty or contract; or (2) demonstrate a fraudulent misrepresentation collateral or extraneous to the warranty or contract; or (3) seek well-pled special damages that are caused by the collateral or extraneous misrepresentation. *Bridgestone/Firestone, Inc. v. Recovery Credit Servs., Inc.*, 98 F.3d 13, 20 (2d Cir. 1996).

Here, there is no allegation in the Complaint of any legal duty separate from that imposed under the alleged warranties. Nor, as shown, is there a misrepresentation alleged that is collateral to the alleged contractual representations. With respect to damages, Plaintiffs' seek "actual," *i.e.*, benefit-of-the-bargain damages, as well as compensatory damages, in their "Prayer for Relief" for their fraud claim; and while Plaintiffs also request punitive damages, they allege no independent facts to support such extraordinary relief. *See* Compl. "Prayer For Relief" at 32. Indeed, it is well settled in New York that punitive damages are not available in so-called ordinary fraud and deceit cases. *See Kelly v. Defoe Corp.*, 223 A.D.2d 529, 636 N.Y.S.2d 123 (2d Dep't 1996). Punitive damages are available only where the defendant acts with evil and reprehensible motives. *Wallach Marine Corp. v. Donzi Marine Corp.*, 675 F. Supp. 838, 842 (S.D.N.Y. 1987). Here, accepting the allegations in the complaint as true, Defendants' representations that they could, would and did engineer and produce the Chevy Uplander in compliance with the TLC's specifications applicable to taxicabs with Accessible Medallions is neither evil nor reprehensible as those terms are understood in the context of punitive damage

---

as wheelchair-accessible taxis"); *id.* ¶ 107 (alleging the vehicles breached the implied warranty of fitness for a particular purpose because they were "not fit for use as wheelchair-accessible taxis").

awards. In fact, there is no allegation in the Complaint that the vehicles did not, in fact, function as New York City taxis. On the contrary, the Complaint indicates that the vehicles were both in and out of service as New York City taxis. The Complaint thus simply alleges that the vehicles did not perform as allegedly promised and warranted. Accordingly, Plaintiffs' plea for punitive damages is not well-pled.

In sum, having failed to allege any duty independent of the alleged contract and warranties, any representation independent of the warranties and contract allegedly breached, and a single fact supporting punitive damages, Plaintiffs' fraud claim should be dismissed.

### 2.    Plaintiffs Have Alleged No Facts that Give Rise to Any Inference of Fraudulent Intent

Although Rule 9(b) allows a plaintiff to allege fraudulent intent generally, a plaintiff must allege facts that give rise to a strong inference of fraudulent intent. *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1128 (2d Cir. 1994). This strong inference can be established either "(a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *Id.* "Mere nonperformance of contractual agreements does not give rise to an inference of fraudulent intent unless 'a defendant violated an agreement so maliciously and so soon after it is made that his desire to do so before he entered into the agreement is evident.'" *PI, Inc. v. Quality Prods., Inc.*, 907 F. Supp. 752, 763 (S.D.N.Y. 1995) (quoting *Powers v. British Vita, P.L.C.*, 57 F.3d 176, 185 (2d Cir. 1995)).

Here, Plaintiffs have failed to allege anything more than Defendants' failure to fulfill warranty and contractual obligations. Plaintiffs have not set forth "strong circumstantial evidence of conscious misbehavior or recklessness," *Shields*, 25 F.3d at 1128, or pled any facts which would indicate that the Defendants did not intend to produce vehicles that complied with

the TLC's specifications. *PI, Inc.*, 907 F. Supp. at 763-64; *see also Shields*, 25 F.3d at 1127-28;

*Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1174-75 (2d Cir. 1993).

Indeed, the Complaint's own allegations decisively rule out the possibility of drawing any

inference of fraudulent intent. For instance, Plaintiffs allege that in "designing and

manufacturing the Vehicles, GM and ElDorado did not sufficiently test and/or properly engineer

the Vehicles. Had they done so, *they would have detected* these substantial defects . . . ." Compl.

¶ 51 (emphasis added). Here, Plaintiffs affirmatively allege that Defendants did not detect – and,

therefore, were not aware of – the alleged defects in the vehicles. It is impossible to square the

allegation that Defendants were not aware of the alleged defects with the allegation that

Defendants knowingly made false statements when they represented that they could produce

vehicles that complied with the TLC's specifications. Elsewhere, Plaintiffs allege that "GM

and/or ElDorado modified the rear axle bar to make the ride of the Vehicles stiffer and *to address*

*the handling concerns expressed by Mr. Shenkman of the TLC in July 2006." Id.* at ¶ 76

(emphasis added). Here, Plaintiffs affirmatively allege that Defendants modified the vehicles to

address the TLC's concerns. Needless to say, it is impossible to reconcile this allegations with

the allegation that Defendants did not attempt to re-engineer the vehicles to address the TLC's

concerns with the initial vehicle delivered in mid-July. Thus, Plaintiffs' conclusory allegations of

fraudulent intent are implausible on their face.

The Complaint, in fact, strongly suggests that Defendants attempted to manufacture

vehicles that complied with the TLC's specifications for wheelchair accessible taxis. For

instance, the Complaint alleges that: (i) Defendants presented a demonstration vehicle to the

TLC in May 2006, *id.* ¶ 57; (ii) after the demonstration vehicle was rejected by the TLC in May,

the TLC approved the Uplander in June 2006, *id.* ¶ 59; (iii) Defendants presented one of two

vehicles Plaintiffs had ordered to the TLC for inspection in mid-July, *id.* ¶ 66; (iv) Defendants'

representatives traveled to New York (the very week the TLC identified issues with the initial

vehicle) to examine the Uplander and another wheelchair accessible vehicle manufactured by

Braun, *id.* ¶ 69; (v) Defendants attempted to address the TLC's concerns, including by

"modif[ying] the rear axle bar to make the ride of the Vehicles stiffer to address the handling

concerns expressed by Mr. Shenkman", *id.* ¶ 76; (vi) after the first 4 vehicles were delivered to

Plaintiffs in November 2006, Plaintiffs ordered forty-eight (48) additional vehicles on December

21, 2006, (*see* Diehl Decl. Exh. B), and (vii) General Motors and ElDorado each issued limited

warranties for the Uplanders, *id.* ¶ 100.  Moreover, that the TLC, in fact, *approved* the Uplander

as a wheelchair accessible vehicle only serves to corroborate the insufficiency of Plaintiffs'

allegations of fraudulent intent concerning whether Defendants could produce vehicles that

complied with the TLC's specifications.

      With respect to Plaintiffs' allegations of a "bait and switch," Plaintiffs do not even allege

that they were shown the demonstration vehicle that was rejected by the TLC on May 10, 2006.

*See id.* ¶ 125.  So much for the "bait."  With respect to the "switch," the nefarious inference that

Plaintiffs ask the Court to draw from the alleged fact that the initial vehicle delivered in mid-July

was different than the demonstration vehicle presented to the TLC in May simply makes no

sense at all.  First, the demonstration vehicle shown to the TLC on May 10 *was rejected by the*

*TLC. See id.* ¶ 57.  The TLC allegedly told Defendants that the vehicle *had to be changed* in

order to be suitable as a wheelchair accessible taxi.  *See id.*  Therefore, that the vehicle delivered

in mid-July was *different* than the demonstration vehicle that the TLC *rejected*, in itself, cannot

give rise to any inference of fraudulent intent.  Second, the TLC issued new specifications for

wheelchair accessible vehicles on May 11, the day after allegedly rejecting the demonstration

vehicle. *Id.* ¶ 58. Therefore, the issue would concern not whether the vehicle delivered in mid-July was different than the demonstration vehicle, but whether the vehicle complied with the TLC's new specifications – a matter, perhaps, of contract and warranty, but not of fraud.

Finally, with respect to the August statement, Plaintiffs allege, solely on the basis of information and belief, that the statement that the first two "re-engineered" vehicles had been approved by the TLC was false. *See* Compl. ¶ 73. However, whether the two vehicles had, in fact, been approved by the TLC would have been known to the TLC, itself, and, for this reason, is not peculiarly within the Defendants' knowledge. Nor do Plaintiffs accompany their information and belief allegations with a any statement of fact on which such allegations are based. Further, Plaintiffs fail to address the fact that TLC, in fact, approved the vehicles, a critical omission, because any representation by Defendants that the vehicles had been approved by the TLC obviously would have been understood to be accurate. Therefore, without more, Plaintiffs' allegation is wholly insufficient and cannot properly give rise to any inference of fraudulent intent.

Plaintiffs' only allegation of fraudulent intent is wholly conclusory, and merely alleges that General Motors and ElDorado never intended to fulfill their promise to produce vehicles that complied with the TLC's specifications, but rather "intended to try and fool the TLC and Plaintiffs into approving and accepting the vehicles as delivered to avoid the time and expense of re-engineering the Uplander and to make a greater profit." Compl. ¶ 127.

As shown above, Plaintiffs not only fail to offer a single fact to support this allegation, but actually contradict it. Nor do Plaintiffs allege any specific or "concrete benefits that could be realized by one or more of the false statements and wrongful nondisclosures alleged." *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1130 (2d Cir. 1994). In this regard, it is well recognized

that mere generalized "allegations that a defendant stands to gain economically from fraud do not satisfy the heightened pleading requirements of Rule 9(b)." *Primavera Familienstiftung v. Askin*, 173 F.R.D. 115, 124 (S.D.N.Y. 1997) (allegations that investment company had an incentive to inflate the price of its funds by misrepresenting the funds' performance was insufficient to allege motive); *Shields*, 25 F.3d at 1129 (allegations that executives "knew" but "concealed" the fact that a bank's financial condition was worse than reported did not adequately plead scienter).[3]

Thus, Plaintiffs have failed to plead any facts giving rise to any inference whatsoever of fraudulent intent.

### 3.    Plaintiffs Have Failed To Allege Justifiable Reliance

Plaintiffs' allegations of reliance on the alleged misstatements are equally unavailing. First, Plaintiffs allege that they relied on Defendants' statements in May 2006 in deciding, sometime later, to bid on the medallions at the June 2006 auction. As discussed above, Mr. Freidman admits that he made the decision to bid on the medallions as early as January 2006 or sooner. *See supra*. at 4. Second, with respect to the June 2006 statements that Defendants would use the TLC-approved specifications in producing the Uplanders, Plaintiffs never state whether such statements were made before or after the medallion auction, and it is therefore impossible to tell from the allegations whether Plaintiffs could have relied on this otherwise innocuous statement in bidding on the medallions. With respect to the July and August 2006 statements, Plaintiffs obviously could not have relied on these statements in deciding to bid on the medallions as the auction had already taken place in June 2006.

---

[3]  If a desire to avoid expense were sufficient to establish fraudulent intent, "executives of virtually every corporation in the United States could be subject to fraud allegations." *Primavera Familienstiftung*, 173 F.R.D. at 124 (allegations of desire to enhance income are insufficient to plead motive).

With respect to any purported reliance on the alleged statements in purchasing the vehicles, Plaintiffs allegations are puzzling to say the least. As discussed, Plaintiffs contend that after they took delivery of all the vehicles purchased in November 2006 – 4 vehicles in total – "[i]t was almost immediately evident . . . that Defendants had failed to comply with their prior material representations that they would supply Plaintiffs with Chevy Uplanders that complied with the TLC's new specifications and were suitable for use as New York City taxis." Compl. ¶ 75. However, as shown by the Sales Orders with Arcola, Plaintiffs proceeded to order 48 additional vehicles on December 21, 2006. *See* Diehl Decl. Exh. B. Thus, Plaintiffs' confused and contradictory allegations, and the documents they rely on, render their claims of reliance wholly implausible.

## III.    PLAINTIFFS HAVE IGNORED THE COURT'S ORDER IN FAILING TO LIMIT THE BREACH OF EXPRESS WARRANTY CLAIMS TO THE LIMITED WARRANTIES ISSUED BY GENERAL MOTORS AND ELDORADO

Finally, as directed by this Court, Plaintiffs were given leave to amend their pleading to attempt to state a claim for breach of express warranty. Plaintiffs were cautioned, however, that any express warranty claims must be predicated on the actual written limited warranties issued by General Motors and ElDorado, respectively. *See* Order at 12 ("evidence of additional warranties is barred by the parol evidence rule as both GM and ElDorado gave the Taxi Companies written warranties."). Further, because each warranty excludes incidental and consequential damages, the Court barred Plaintiffs from seeking such damages in an amended pleading. *See id.* at 13 ("the Taxi Companies are barred from recovering incidental or consequential damages.").

The vestiges of Plaintiffs' prior dismissed allegations, however, are improperly pled in the current Complaint. Thus, ignoring the actual terms of the written warranties, Plaintiffs allege that "Defendants advertised, represented and warranted to Plaintiffs that the Vehicles complied

with the American Disabilities Act (ADA), the Administrative Code of the City of New York, and the TLC wheelchair-accessibility requirements." Compl. ¶ 54. This allegation was specifically cited by the Court as an example of the "vague statements" that are barred. *See* Order at 12-13, n.48.

Thus, in derogation of the Court's Order, Plaintiffs persist in seeking to expand the scope of their express warranty claims beyond the terms of the limited warranties issued by General Motors and ElDorado, respectively. Plaintiffs also have alleged damages far exceeding the maximum amount of damages recoverable for breach of warranty, and, for this reason, have also ignored the Court's Order. *See id.* at 13 (ruling that Plaintiffs "are barred from recovering incidental or consequential damages").

For these reasons, Plaintiffs' breach of express warranty claims should be dismissed as violating the Court's Order.

## CONCLUSION

Accordingly, Defendants General Motors and ElDorado respectfully request that this Court dismiss the Complaint for failure to state a claim pursuant to Federal Rules of Civil Procedure 12(b)(6) and 9(b), and grant such other relief as the Court deems just and proper.

Dated: April 13, 2009

**AKIN GUMP STRAUSS HAUER & FELD LLP**

By:    /s/  Jamison A. Diehl_____
       Robert H. Pees
       Jamison A. Diehl
       Akin Gump Strauss Hauer & Feld LLP
       One Bryant Park
       New York, New York 10036
       (212) 872-1000 (Telephone)
       (212) 872-1002 (Facsimile)

       *Attorneys for Defendants ElDorado National, Inc.*


**LAVIN, O'NEIL, RICCI, CEDRONE & DISIPIO**

By:    /s/  Timothy J.  McHugh_____
       Timothy J. McHugh
       Lavin, O'Neil, Ricci, Cedrone & DiSipio
       420 Lexington Avenue
       Graybar Building
       Suite 2900
       New York, New York 10170
       Telephone:  (212) 319-6898
       Facsimile:  (212) 319-6932

       *Attorneys for Defendant General Motors*